<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **BEST SIGN SYSTEMS, INC.,** | : | **Civil Action No.: 09-5244 (FLW)** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| **JAMES L. CHAPMAN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

<u>ARPERT, U.S.M.J.</u>

## I.     INTRODUCTION

This matter comes before the Court on a Motion by Defendants James L. Chapman ("Chapman") and Tactile Consulting Group ("Tactile Consulting") (collectively, "Defendants") to quash the Subpoenas issued by Plaintiff Best Sign Systems, Inc. ("Plaintiff" or "Best Sign") [dkt. entry no. 44], returnable September 4, 2012.  Plaintiff filed opposition on August 22, 2012. *See* dkt. entry no. 46.  Defendants filed a reply brief on August 27, 2012.  *See* dkt. entry no. 47. For the reasons stated herein, Defendants' Motion is **DENIED**.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff manufactures "sign products that are designed and produced to comply with certain public building codes and architectural requirements under the Americans with Disabilities Act ("ADA")" and "offers a portfolio of products and manufacturing processes to create customized ADA compliant signs which it sells to architectural signage providers".  *See* Pl.'s Compl., dkt. entry no. 1 at 1.  Mr. Chapman "is a former employee of Tactile Graphics, LLC ("Tactile Graphics"), the manufacturing arm of the North Carolina corporation Quality Sign

Systems, Inc. d/b/a ASI-Modulex ("ASI"), also a producer of ADA signage". *Id*. at 1-2. "Until early 2007, Mr. Chapman worked in Research and Development and as salesperson for Tactile Graphics". *Id*. at 2. Tactile Graphics "developed as its primary method for manufacturing ADA signage a plastic molding process called thermoforming (or thermomolding) whereby a flat sheet of heated plastic is stretched or pressed across a prepared mold to create a placard or sign of thermoplastic material". *Id*. at 2. Plaintiff "acquired Tactile Graphics and all of its assets, including its equipment, technology, and intellectual property interests, from ASI in October 2007", thereby allowing Plaintiff "to expand its product offerings in the industry" to include Tactile's thermoforming process. *Id*.

Plaintiff notes that Mr. Chapman "signed a consultant confidentiality agreement" on October 17, 2005, which "contained a confidentiality provision stating that the 'Consultant covenants and agrees with the Company that he or she will not, either during the term of his/her employment, or at any time thereafter, disclose to anyone, or to any entity, directly or indirectly, any such confidential information, as identified herein'". *Id*. Mr. Chapman "was terminated as an employee of Tactile Graphics at the time of the acquisition by [Plaintiff]" and on October 23, 2007 "he executed an Agreement Concerning Confidential Information of Tactile Graphics...by which he agreed to hold in strict confidence and 'not disclose in any manner' certain confidential information of Tactile Graphics, including the method and apparatus used in the manufacturing [of] thermoformed signs". *Id*. at 3. Presently, "Mr. Chapman operates his own independent consulting firm, Tactile Consulting and is a former employee of The Sign Works, Inc. ("SignWorks"), also a manufacturer of ADA signs". *Id*.

In a Complaint filed on October 14, 2009, Plaintiff claimed that "[d]espite his

2

confidentiality obligations, Mr. Chapman...breached his confidentiality agreements by disclosing information about the thermoforming process to potential customers of both Tactile Consulting and SignWorks, many of which are customers and contacts of Tactile Graphics". *Id.* Specifically, Plaintiff alleged that Mr. Chapman "distributed thermoforming promotional materials, specifications, process manuals, and equipment catalogs to potential customers...and marketed the manufacturing capabilities of SignWorks and consulting services of Tactile Consulting in the areas of thermoformed sign production". *Id.* On October 15, 2009, U.S. District Judge Freda L. Wolfson entered a Temporary Restraining Order ("TRO") against Mr. Chapman, Tactile Consulting, and their agents, servants, employees, attorneys, successors, assigns, and all others in privity and acting in concert or participation with them, from:

> (A) Entering into an employment relationship or undertaking any consulting work or job duties whereby they would be called upon to violate the terms of Mr. Chapman's Agreement Concerning Confidential Information of Tactile Graphics dated October 23, 2007..., Confidential and Nondisclosure Agreement dated February 20, 2007..., and consultant confidentiality Agreement dated October 17, 2005..., collectively with the October Confidentiality Agreement and February Confidentiality Agreement...("Confidentiality Agreements");
>
> (B) Using or disclosing Best Sign's trade secrets or confidential or proprietary information, including but not limited to Plaintiff's thermoforming sign manufacturing process, for or to SignWorks..., Tactile Consulting, or any other competitor of Best Sign;
>
> (C) Revealing any of Best Sign's trade secrets or confidential or proprietary information, including but not limited to Plaintiff's thermoforming sign manufacturing process, to present or future customers and any other person or entity, or otherwise violating the Confidentiality Agreements, and
>
> (D) Disseminating or disclosing publicly to any third party, or otherwise using, any of Best Sign's trade secrets or confidential or

3

> proprietary information, including but not limited to Plaintiff's
> thermoforming sign manufacturing process, or conspiring to do the
> same.

*See* dkt. entry no. 3.

After oral argument of Plaintiff's motion for a preliminary injunction, Judge Wolfson entered an Order on September 9, 2010 granting Plaintiff's motion which "preliminarily restrained and enjoined...[Mr. Chapman] from using or disclosing any and all information relating to the steps, processes, times and pressures of the thermoforming sign manufacturing process as it pertains to the development and manufacture of interior Americans with Disabilities Act-compliant Braille signage". *See* dkt. entry no. 29. On September 27, 2010, Judge Wolfson entered a Consent Order whereby the Parties agreed "to enter into a permanent injunction consistent with the preliminary injunction on September 8, 2010" and "to full settlement of the above-captioned litigation" and this matter was closed. *See* dkt. entry no. 31.

On March 16, 2012, Plaintiff filed an application seeking to have this matter reopened for purposes of "enforcing the permanent injunction order against...[Mr.] Chapman for contempt". *See* Pl.'s Br., dkt. entry no. 32-4 at 1. On March 20, 2012, Judge Wolfson entered an Order to Show Cause reopening this matter "for the limited purpose" of addressing Plaintiff's application to hold Mr. Chapman in contempt of the September 27, 2012 Consent Order. *See* dkt. entry no. 33. After a hearing and status conference with the Parties, Judge Wolfson entered an Order on April 16, 2012 permitting Plaintiff to depose Mr. Chapman and compelling Mr. Chapman to "produce documents in response to Plaintiff's document demands", subject "to an attorney's eyes only protective order", related to "individuals, companies or entities that are identified in Plaintiff's order to show cause papers or either produce Braille signs or that are interested in

4

producing or developing Braille signs".  *See* dkt. entry no. 38.  Further, Judge Wolfson indicated that "[f]ollowing [Mr. Chapman's] production of documents, Plaintiff may seek to subpoena depositions and/or documents from any individuals, companies or entities that are identified in the documents produced by [Mr. Chapman]" and that "[s]uch subpoenas shall be served after conferring with Magistrate Judge Douglas Arpert on notice to [Mr. Chapman]".  *Id*. Subsequently, Judge Wolfson denied Plaintiff's application to "show documents produced by...[Mr.] Chapman and designated as Attorneys' Eyes Only to a technical representative of...[Best Sign]" but permitted Plaintiff, subject to the terms of the Protective Order, to "retain an independent expert to review and discuss the documents for the purpose of better understanding the relevant technology".  *See* dkt. entry no. 40.

After telephone status conferences with the Court on June 13, 2012 and July 9, 2012, Plaintiff was granted permission to serve the types of subpoenas contemplated by Judge Wolfson. On August 9, 2012, Defendants filed the present Motion to quash the third-party subpoenas served by Plaintiff on Garnett Sign Studio ("Garnett"), Stamprite Supersine ("Stamprite") and H. Toji & Co. ("Toji & Co.").  *See* dkt. entry nos. 43-44; *see also* Decl. of John A. Zolman, III, Esq. ("Zolman"), dkt. entry no. 44-2 at Ex. E.

## III.    ARGUMENT

### A.    Defendants' Arguments in Support of the Motion

#### 1.    Plaintiff has produced no evidence of contempt sufficient to justify further discovery.

Defendants contend that "[d]espite the number of its various submissions to the Court thus far, Plaintiff has not produced a single item of evidence demonstrating that Mr. Chapman

has done anything to contravene...the September 27, 2012 Consent Order". *See* Def.'s Br., dkt. entry no. 44-1 at 7-8. Rather, "Plaintiff merely points to the fact that Mr. Chapman has worked in some unspecified capacity with a company called Accubraille...and that he entered into a consulting agreement with its parent company, Garnett Sign Studios[,] relative to thermoforming". *Id*. at 8. Defendants argue that "[n]either of these facts demonstrates any violation of the Consent Order...which does not purport to preclude Mr. Chapman from developing his own thermoforming methods, consulting as to thermoforming outside of the Braille/ADA context, selling press equipment, or marketing the finished product in the wholesale market". *Id*. "Mr. Chapman and several others have now certified to the Court...[that] such were the limits of his involvement with either company". *Id*. Defendants maintain that "because the information subpoenaed will...be of scant benefit to Plaintiff...while exposing the subject parties to substantial burden in compiling the requested documents and sacrificing business time for depositions, the same should be quashed". *Id*. Defendants argue that "Plaintiff's continued search for some non-existent wrong to justify this action constitutes an unreasonable fishing expedition...which neither Mr. Chapman...nor the subject parties...should be compelled to endure". *Id*.

## 2. Plaintiff's subpoenas are premature, as the scope of the information sought has not been narrowed through a deposition of Mr. Chapman.

Defendants note that Plaintiff "has now issued subpoenas to parties in at least two states and three separate Federal Districts in an attempt to develop information sufficient to sustain...its suspicions surrounding Mr. Chapman's compliance with the September 27, 2010 Consent Order". *Id*. at 8. Specifically, "Plaintiff seeks a variety of documents...with accompanying

testimony as to nearly every aspect of Mr. Chapman's involvement with and services to Garnett Sign Studios, Stamprite Signs , Toji & Co., and Sharon Toji" and "does not limit its requests to information relative to Braille or the ADA context, but rather[,] queries these entities as to the nature of Mr. Chapman's involvement with their thermoforming processes in general". *Id*. at 8-9. As such, Defendant maintains that "Plaintiff's requests are...manifestly overbroad". *Id*. at 9. Defendants argue that "[w]ithout...pausing to narrow the issues and/or elicit testimony from Mr. Chapman through a deposition despite multiple invitations to do so, Plaintiff seeks to interrupt the business operations of at least three of its competitors in the sign industry and to detain each of their officers/principles for significant periods of business time to conduct depositions". *Id*. Defendants maintain that "Plaintiff's omission of this important step is suspect...because...Plaintiff has produced no evidence of any violation on the part of Mr. Chapman...and[,] without his testimony, Plaintiff has nothing to impeach". *Id*. "Given that the subpoenaed entities are Plaintiff's competitors in the sign industry, and given its history of interference in Mr. Chapman's independent business pursuits", Defendants claim that "Plaintiff's broad and invasive approach to discovery merits the suspicion of the Court". *Id*.

> **3.** **Any documents and/or testimony produced in response to Plaintiff's subpoenas should be subject to an attorney's eyes only protective order.**

Citing FED. R. CIV. P. 26(c)(1), Defendant notes that "[u]pon the motion of a party and for good cause...[c]ourts are empowered to issue such orders as may be necessary to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense". *Id*. "Among other things, a [c]ourt may forbid the discovery, prescribe a discovery method other than the one selected by the party seeking discovery, forbid inquiry into certain matters, designate who

may be present during the discovery, and/or require that trade secrets and other confidential information not be revealed". *Id*. at 9-10.  Defendants also note that pursuant to FED. R. CIV. P. 45(c)(B), "if a subpoena...requires disclosure of a trade secret or other confidential research, development, or commercial information the Court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena" or "may order appearance or production only upon specified conditions".  *Id*. at 10.

Defendants maintain that if "upon review of the affidavits and transcript submitted herewith...the Court is...unwilling to quash Plaintiff's subpoenas in their entirety, Mr. Chapman requests that all testimony and documents to be produced pursuant thereto remain subject to an attorney's eyes only protective order".  *Id*.  "Without such an order, confidential and potentially proprietary information belonging to Mr. Chapman...as well as the subpoenaed entities will be subject to disclosure to one of their direct competitors in the signage industry".  *Id*.  More specifically, Defendants note that Plaintiff's subpoenas "seek all documents and communications concerning Mr. Chapman's contracts and relationships with Garnett Sign Studio, Stamprite Supersign, and H. Toji & Co." and "demand the same information with respect to his services and training to these organizations".  *Id*.  "Should such documents and information be produced, Plaintiff will potentially be instantly privy to the intimate details of its competitors' processes, including their equipment, training, techniques, product lines, and marketing strategies because Mr. Chapman provides services relative to the sale of thermoforming press equipment, training as to its use, and marketing of the finished signage...as he is permitted to do".  *Id*.

Defendants argue that "[s]uch disclosure is entirely unwarranted in an action expressly brought 'for the limited purpose of enforcing the permanent injunction order against

Defendant[s]' and [that] the confidentiality of the subpoenaed parties' processes must be maintained". *Id*. at 10-11. Further, "Mr. Chapman has developed his own thermoforming processes since the termination of his employment with Tactile Graphics/Plaintiff" and Defendants maintain that same "is itself entitled to protection". *Id*. at 11. Defendants note that "[s]imilar concerns over the confidentiality of Mr. Chapman's information...[resulted in] Judge Wolfson's previous Order restricting access to his responses to Plaintiff's demands for production...". *Id*. "Such concerns are heightened here", Defendants claim, because "the interests of several non-parties...in addition to those of Mr. Chapman are at stake...and similar protections are thus also merited". *Id*. Defendants argue that "[a]bsent a corresponding Order with respect to Plaintiff's subpoenas, Judge Wolfson's earlier Order will have accomplished nothing...and additional parties will suffer disclosure of their confidential and proprietary information". *Id*.

### B. Plaintiff's Arguments in Opposition to the Motion

Initially, Plaintiff cites *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) for the proposition "that the federal rules allow broad and liberal discovery". *See* Pl.'s Opp'n Br., dkt. entry no. 46 at 4. In this instance, Plaintiff "has served three narrowly-tailored subpoenas to non-parties who had consulting or other employment-related relationships with Mr. Chapman". *Id*. Defendants' "motion provides no legal basis under the Federal Rules to deny Plaintiff this commonly employed discovery tool" nor does Mr. Chapman "provide any legal justification for [the] Court to reverse itself on its prior authorizations just weeks ago for [Plaintiff] to serve these subpoenas". *Id*.

### 1. The Non-Party subpoenas are warranted.

Plaintiff maintains that it "served these subpoenas to discover critical facts concerning Mr. Chapman's violation of the Permanent Injunction Order entered against him". *Id*. "These subpoenas are based on information and entities disclosed in Mr. Chapman's limited document production to date as previously authorized by [the] Court". *Id*.

> **(a)   The Non-Party subpoenas are warranted because of Mr. Chapman's contractual obligations violate the permanent injunction order to certain companies.**

Plaintiff argues that "[t]he documents produced thus far by [Mr.] Chapman confirm that [Mr.] Chapman has contractually obligated himself to violate the Permanent Injunction Order with at least three companies". *Id*. at 5. "For example, [Mr.] Chapman's consulting agreements with Garnett and Stamprite both provide:

> -'Whereas, the Company is in need of assistance in the development of Sign Thermoforming'
>
> -'Whereas, [Mr. Chapman] has agreed to perform consulting work for the Company in providing complete process development support and consulting services and other related activities as directed by the Company'
>
> -'[Mr. Chapman shall deliver] detailed process specifications required to thermoform various materials such as acrylics, Kydex and other thermoforming materials'
>
> -'[Mr. Chapman shall deliver] training manuals and written procedures for the thermoform process'.

*Id*. Plaintiff asserts that "[t]hese consulting agreements indicate on their face [Mr.] Chapman's intent to violate the Permanent Injunction Order by disclosing complete thermoforming process specifications to [Plaintiff's] competitors in the interior Braille sign market" and, as a result, Plaintiff has "served the subpoenas on these entities to discover the extent of [Mr.] Chapman's

10

consulting activities...to determine the details and extent of [his] contempt". *Id.*  Plaintiff also notes that a "third consulting agreement with non-party Braille Sign Supplies contains similar provisions" but Plaintiff "has not served a subpoena on Braille Sign Systems...because it is an Australian Company with no known agent for service of a subpoena within the United States". *Id.*  Plaintiff "reserves its right to serve a subpoena on that company as well" should a "domestic agent for service...become known". *Id.*

In addition, Plaintiff maintains that "documents produced by [Mr.] Chapman further reveal that he disclosed the thermoforming process in direct violation of the Permanent Injunction Order to [Plaintiff's] competitors, including Garnett". *Id.* at 5-6.  For example, Plaintiff claims that "a manual [Mr.] Chapman admits he disclosed contains specific steps, processes, times and pressures of the thermoforming sign manufacturing process". *Id.* at 6.  As such, Plaintiff argues that "[d]iscovery from these non-parties is absolutely warranted...given this...evidence that [Mr.] Chapman repeatedly entered into contracts with competing Braille sign manufacturers to provide complete thermoforming process development in violation of this Court's Permanent Injunction Order". *Id.*  Further, despite Defendants' contention that any "documents and subpoenas should be subject to an Attorneys' Eyes Only protective order", Plaintiff notes that the "protective order currently in place pertains only to documents produced by [Mr.] Chapman" and he "does not have standing to assert confidentiality over non-party documents". *Id.*  "To the extent that the non-parties wish to claim confidentiality", Plaintiff states that "they are free to do so independently". *Id.*

> **(b)**    **The subpoenas are warranted to obtain documents not produced by Mr. Chapman.**

Plaintiff argues that the subpoenas are "also needed because [Mr.] Chapman has been unable to produce documents demanded during party discovery that are referenced in his own document production". *Id*. at 6. Specifically, Mr. Chapman has not produced and does not have in his possession "internal documents from these companies relating to the negotiation of [Mr.] Chapman's consultancy agreements and the scope of his work for these companies". *Id*. Plaintiff claims that "[m]any such documents, which are at the center of this contempt proceeding, would be solely in the custody of these non-parties". *Id*. "Further, despite numerous text references and pictures of Braille thermoformed sign samples throughout [Mr.] Chapman's promotional literature, [he] has not provided sign samples in response to [Plaintiff's] March 20, 2012 discovery demand for them". *Id*. Plaintiff maintains that despite "[n]umerous e-mails produced by [Mr.] Chapman [that] indicate...he provided or assisted in providing thermoformed sign samples to prospective employers, customers and competitors of [Plaintiff]...including[,] but not limited to[,] Garnett, Stamprite and Toji...just weeks before [Plaintiff] served its document demands", Mr. Chapman "has indicated that he does not have any thermoformed Braille sign samples". *Id*. at 6-7. As such, Plaintiff's subpoenas "each request thermoformed Braille sign samples from the respective non-parties" and Mr. Chapman's motion "must...be denied to allow [Plaintiff] to obtain samples of the Braille thermoformed signs provided to them by [Mr.] Chapman". *Id*. at 7.

Plaintiff notes that Mr. Chapman "has also been unable to produce the 'Thermoforming and the New ADA' manual, among other documents, referred to in...e-mails" which Mr. Chapman claims was drafted by Sharon Toji". *Id*. Further, "in one e-mail to the president of Garnett, [Mr.] Chapman confesses that his business relationship with Ms. Toji is 'not quite a

partnership, just a way to cover my ass'". *Id*. Therefore, "[d]iscovery of H. Toji & Co. is also needed to investigate [Mr.] Chapman's claims regarding Ms. Toji's involvement with his consultancy work with Braille sign manufacturers". *Id*. Plaintiff argues that "[c]ontrary to his misguided contention, [Mr.] Chapman's employment of Ms. Toji to write the Braille on signs while [Mr. Chapman] provides [Plaintiff's] competitors with the proprietary thermoforming process to manufacture those signs does not absolve [Mr.] Chapman from complying with the Permanent Injunction Order". *Id*. Thus, Plaintiff argues, "[d]iscovery...[related to] this issue is...also needed for this contempt proceeding". *Id*.

### 2. The subpoenas are reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff notes that Defendants' motion "is primarily focused on quashing outright all three subpoenas in their entirety rather than seeking to narrow individual requests within them". *Id*. Mr. Chapman raises the potential for narrowing the subpoenas "only once, alleging that 'Plaintiff does not limit its requests to information relative to Braille or the ADA content'". *Id*. at 7-8. Plaintiff asserts that although Mr. Chapman "emphasizes various other portions of this request to make his point, he conveniently and erroneously neglects to acknowledge that exact limitation therein to 'interior tactile or Braille signs'". *Id*. at 8. Thus, Plaintiff argues that Mr. Chapman's example "undermines[,] rather than proves[,] his...point". *Id*.

Nonetheless, Plaintiff maintains, "[t]o the extent that any of the other requests in the subpoenas are directed to thermoforming signs generally and do not contain a specific 'Braille' limitation, such requests are still reasonably calculated to lead to the discovery of admissible evidence". *Id*. Plaintiff claims that "[c]ertain relevant documents may relate to Braille

13

thermoformed signs even if the communication itself does not specifically contain the word 'Braille'". *Id*. "For example, an email or other document may contain the word 'tactile' or may not contain the word 'Braille' at all" and this is "particularly true in the context of an all-Braille product...such as Garnett's AccuBraille line". *Id*. As such, Plaintiff maintains that its requests need "to be broad enough to capture such communications" because "it is the disclosure of the thermoforming process, and not the reading or writing of Braille, that is relevant here". *Id*.

Defendants' motion "quotes extensively...[from] the preliminary injunction...[hearing] on September 9, 2010 and therefore pre-dates the Permanent Injunction Order at issue here". *Id*. at 9. Consequently, Defendants' position that Mr. Chapman is only "enjoined from acts that would require the reading or writing of Braille" is incorrect. *Id*. Plaintiff argues, "the quotations cited by Defendant[s] are out of context and should be read as intended, *i.e.*, that the Braille reference pertains to the Braille sign market". *Id*. In fact, Plaintiff claims, "requests relating to thermoformed signs without a Braille limitation were contemplated as appropriate by this Court" given that Judge Wolfson indicated during the April 11, 2012 hearing that Plaintiff was "entitled to receive any of the consultant agreements or sales agreements that [Mr. Chapman had] entered into with [certain] companies that define the scope of what your work is" including "any emails or correspondence with regard to what it is that [Mr. Chapman was] doing". *Id*. at 8-9. "The Court...did not limit discovery of [Mr.] Chapman's consulting work with these companies solely to writing Braille on signs, it included companies in the Braille sign market or interested in entering the Braille sign market" and Judge Wolfson "further clarified...that discovery 'would also include if there [were] any communications [Mr. Chapman was] having with companies that are looking to develop a Braille sign'". *Id*. at 9.

Plaintiff argues that "the Permanent Injunction Order precludes [Mr.] Chapman's disclosure of the thermoforming process at any stage of 'development and manufacture' of Braille signs...which includes stages before the Braille dots are added". *Id*. Plaintiff maintains, therefore, that "[d]iscovery...[related to] these topics is therefore appropriate and...reasonably...[calculated] to lead to the discovery of relevant evidence". *Id*.

### 3.    The Declarations submitted by Mr. Chapman support Plaintiff's case.

Plaintiff notes that Mr. Chapman's "misguided premise for this motion...is that non-party discovery is not needed because he can not read Braille and therefore could not possibly have violated the Permanent Injunction Order" and therefore "the declarations submitted on [his] behalf in support of his motion are dedicated to establishing that [Mr.] Chapman does not know how to read or write Braille". *Id*. at 9-10. Specifically, Edward Dougherty ("Dougherty") states that "at no time during his employment with Tactile Graphics did Mr. Chapman receive any training related to complying with the Americans with Disabilities Act or its regulations..and at no time was he trained to read or write Braille". *Id*. at 10. Sharon Toji reiterates that Mr. Chapman "has never involved himself in learning or applying any of the rules and regulations applicable to ADA compliant signage". *Id*. Mr. Chapman confirms that he "cannot and do[es] not offer opinions on ADA Braille compliance...[because] it is beyond [his] scope of knowledge". *Id*. Plaintiff argues that these declarations miss the point and that Mr. Chapman "understands this" given that "[h]is promotional material from July 29, 2009 which prompted this entire case proclaims, '[f]or the first time you can produce the highest quality custom-raised ADA compliant signage with perfectly domed Braille using these materials'". *Id*. "Thus, [Mr.] Chapman has been promoting [Plaintiff's] thermoforming process for Braille signs for years

15

without knowing how to read or write Braille, which is exactly what he is permanently enjoined from doing by the Permanent Injunction Order". *Id*.

Plaintiff concedes that Mr. Chapman "can not read Braille", that "he did not learn it while at [Plaintiff's] predecessor company...Tactile Graphics", and that Plaintiff "does not have a proprietary interest in Braille". *Id*. Plaintiff also acknowledges that Mr. Chapman "did not write Braille on signs [previously], so he would not be precluded from writing Braille now under his various non-compete agreements". *Id*. Rather, Plaintiff's motion for contempt "is based on [Mr.] Chapman's disclosure to [Plaintiff's] competitors of the proprietary thermoforming process he learned while at Tactile Graphics" and it is Plaintiff's "underlying proprietary thermoforming sign process – which remains the same with or without Braille – that [Mr.] Chapman can not disclose to competitors in the interior Braille sign market". *Id*. at 10-11.

Plaintiff argues that Defendants' declarations actually "support [Plaintiff's] position". *Id*. at 11. For example, Mr. Dougherty states that while at Tactile Graphics:

> -[Mr.] Chapman was a thermoforming specialist and did not involve himself in any of the other area of production. Mr. Chapman had no reason to know the details of any other part of the process, including how customer artwork was received, how it was translated, how molds were tooled and cut, how Braille was tooled, how the final product was cut, or how completed signs were inspected and/or shipped. This information was never provided to him during his employment with Tactile Graphics.
>
> -Tactile Graphics was not responsible for verifying the ADA compliance of any artwork received from its customers. It was solely a production facility without any expertise in ADA or Braille regulations.

*Id*. Mr. Chapman "himself admits that the thermoforming process remains the same regardless of whether Braille dots are placed on the interior sign". *Id*. As such, "whether [Mr.] Chapman

16

can read Braille is irrelevant to his contempt of the Permanent Injunction Order because the confidential and proprietary process is still the same". *Id*.

Plaintiff maintains that Mr. Chapman's interpretation of the Permanent Injunction Order "appears to restrict [its] application...only to the writing of Braille in mold designs[,] a task which he concedes he did not perform for Plaintiff's predecessor". *Id*. at 12. Thus, "[a] trade secret restriction limited to mold design...would not make sense". *Id*. Noting that "[m]olds may contain a variety of design elements or logos", Plaintiff claims that a "mold may contain the image of a corporate logo, Chinese text[,] ...or Braille" and that "[t]hese design elements for the mold differ on each individual sign and are dictated by the customer or by regulations". *Id*. Plaintiff argues that "[t]hese superficial design elements on the molds are obviously not [Plaintiff's] trade secret". *Id*. Rather, "the times, temperatures and other specifications of the thermoforming process for making the signs is the trade secret". *Id*. "Even if [Mr.] Chapman had designed Braille molds for Tactile Graphics in the past (which he testifies he did not)", Plaintiff contends that "the Permanent Injunction Order is not limited to the design of molds" and "applies to all the 'steps, processes, times and pressures of the thermoform sign manufacturing process'". *Id*.

In sum, Plaintiff argues that "[Mr.] Chapman's ability to read and write Braille is...irrelevant...and the subpoenas are appropriate and necessary to discover the extent of [Mr.] Chapman's contempt". *Id*. at 13.

### 4.   Mr. Chapman's deposition is not a substitute for Non-Party discovery.

Noting that Mr. Chapman suggests that "instead of seeking discovery from non-parties,

[Plaintiff] should just ask him whether he violated the Permanent Injunction Order" given that he "has repeatedly denied the allegations against him", Plaintiff maintains that "discovery in Federal Court...is not so constrained". *Id*. Rather, Plaintiff contends that "[n]on-party discovery is needed here...given [Mr.] Chapman's feigned ignorance of the plain meaning of the Permanent Injunction Order...and underlying confidentiality agreements...and [Mr. Chapman's] questionable credibility after repeatedly changing his story with respect to the nature of his consulting work". *Id*. Specifically, Plaintiff claims that Mr. Chapman initially asserted "that he only sold thermoforming presses and equipment". *Id*. However, "when [Mr.] Chapman's webpages and other documents indicated otherwise, he changed his story" and certified to the Court "that he was merely a 'sign broker' who was not involved with the disclosure of the thermoforming process". *Id*. "Finally, after [Mr.] Chapman's own documents contradicted his second explanation", Plaintiff maintains that he "changed his story yet again" and asserted that "although he disclosed [Plaintiff's] thermoforming process to other Braille sign manufacturers, he did not violate the Permanent Injunction Order simply because he can't read Braille". *Id*.

Plaintiff argues that Mr. Chapman's efforts are "absurd on [their] face" because "[t]he Permanent Injunction Order does not provide – and Judge Wolfson did not intend – that it becomes effective only upon [Mr.] Chapman learning to read Braille". *Id*. Noting that "Braille is not confidential or proprietary", Plaintiff maintains that "[w]hat is confidential and proprietary...and protected by a plain reading of the Permanent Injunction Order...is [Plaintiff's] thermoforming process" and Mr. Chapman "is enjoined from disclosing [Plaintiff's] process to competitors in the Braille interior sign market". *Id*. at 13-14. Therefore, Plaintiff claims, "[t]he only question remaining is the extent of his contempt, information about which rests in the

18

custody of the non-parties that have been subpoenaed". *Id*.

## IV.   DISCUSSION

### A.   Legal Standards

#### 1.   Discovery

Pursuant to FED. R. CIV. P. 26(b)(1), "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and "the court may order discovery of any matter relevant to the subject matter involved in the action", although "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence". *See also Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000). Importantly, pursuant to FED. R. CIV. P. 26(b)(2)(C), "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

The precise boundaries of the Rule 26 relevance standard depend upon the context of each particular action, and the determination of relevance is within the discretion of the District Court. *See Barnes Found. v. Twp. of Lower Merion*, 1996 WL 653114, at *1 (E.D. Pa. 1996). Importantly, "Courts have construed this rule liberally, creating a broad vista for discovery".

*Takacs v. Union County*, 2009 WL 3048471, at *1 (D.N.J. 2009)(*citing Tele-Radio Sys. Ltd. v. DeForest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Evans v. Employee Benefit Plan*, 2006 WL 1644818, at *4 (D.N.J. 2006).  However, "a discovery request may be denied if, after assessing the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues, the District Court finds that there exists a likelihood that the resulting benefits would be outweighed by the burden or expenses imposed as a consequence of the proposed discovery".  *Takacs*, 2009 WL 3048471, at *1; *see also Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).  "The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry".  *Takacs*, 2009 WL 3048471, at *1 (*citing Bowers v. National Collegiate Athletic Assoc.*, 2008 WL 1757929, at *4 (D.N.J. 2008)); *see also Leksi, Inc. v. Federal Ins. Co.*, 129 F.R.D. 99, 105 (D.N.J. 1989); *Public Service Group, Inc. v. Philadelphia Elec. Co.*, 130 F.R.D. 543, 551 (D.N.J. 1990).

##### 2.      Rule 45: Subpoena

Pursuant to Fed. R. Civ. P. 45(c)(3),

> (3) Quashing or Modifying a Subpoena.
>> (A) When Required.  On timely motion, the issuing court must quash or modify a subpoena that:
>>> (i) fails to allow a reasonable time to comply;
>>> (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person--except that, subject to Rule 45(c)(3)(B)(iii), the person may be

commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

The Court notes that "[a]n undue burden exists when the subpoena is 'unreasonable or oppressive'". *In re Lazaridis*, 2011 WL 3859919, at *2 (D.N.J. 2011) (*quoting Schmulovich v. 1161 Rt. 9 LLC*, 2007 WL 2362598, at *4 (D.N.J. 2007)). "There is no 'strict definition of unreasonable or oppressive' and courts have used several factors in determining a subpoena's reasonableness: (1) the party's need for the production; (2) the nature and importance of the litigation; (3) the relevance of the material; (4) the breadth of the request for production; (5) the time period covered by the request; (6) the particularity with which the documents are described;

and (7) the burden imposed on the subpoenaed party". *Id*. (*quoting Schmulovich*, 2007 WL 2362598, at \*4). "On a motion to quash, it is the moving party's burden to demonstrate that the subpoena is burdensome and unreasonable". *Id*. (*citing Schmulovich*, 2007 WL 2362598, at \*4).

### B.    Defendants' Motion

Initially, the Court notes that FED. R. CIV. P. 26 has been "construed...liberally, creating a broad vista for discovery". *Takacs v. Union County*, 2009 WL 3048471, at \*1 (D.N.J. 2009)(*citing Tele-Radio Sys. Ltd. v. DeForest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Evans v. Employee Benefit Plan*, 2006 WL 1644818, at \*4 (D.N.J. 2006). Having reviewed the Subpoenas issued by Plaintiff to non-parties Garnett, Stamprite, and Toji & Co. (*see* Decl. of Zolman at Ex. E) and given the Order previously entered by Judge Wolfson indicating that Plaintiff could "seek to subpoena depositions and/or documents from any individuals, companies or entities that are identified in the documents produced by [Mr. Chapman]" (*see* dkt. entry no. 38), the Court finds that Defendants have failed to sustain their burden of demonstrating that any of the required or permissive reasons to quash the Subpoenas at issue *in toto* exist in this instance (FED. R. CIV. P. 45(c)(3); *see also In re Lazaridis*, 2011 WL 3859919, at \*2 (D.N.J. 2011)).

However, with respect to scope, the Court finds that Plaintiff's Subpoenas should be circumscribed to information related to "interior tactile or Braille signs" (Pl.'s Opp'n Br. at 7-8) in order to avoid imposing an undue burden that is "unreasonable or oppressive" on the third parties (*In re Lazaridis*, 2011 WL 3859919, at \*2). Further, in order to protect confidential and/or trade secret information (*see* FED. R. CIV. P. 26(c)(1)), in the first instance the Court finds that any information obtained by Plaintiff in response to the Subpoenas should be subject to the

22

same attorneys' eyes only Protective Order set forth in the Order entered by Judge Wolfson on April 16, 2012 (*see* dkt. entry no. 38).  Thereafter, if necessary, Plaintiff may request relief from this Protective Order.

## V.       CONCLUSION AND ORDER

The Court having considered the papers submitted pursuant to FED. R. CIV. P. 78, and for the reasons set forth above;

**IT IS** on this 26th day of September, 2012,

**ORDERED** that Defendants' Motion to quash the Subpoenas issued by Plaintiff [dkt. entry. no. 44] is **DENIED**; and it is further

**ORDERED** that the Court will conduct a telephone status conference, to be initiated by defense counsel, on **November 21, 2012** at **11:00 a.m.**

s/ *Douglas E. Arpert*
**DOUGLAS E. ARPERT**
**UNITED STATES MAGISTRATE JUDGE**